Morris v. Scenera Research, LLC, 2011 NCBC 33.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 19678

ROBERT PAUL MORRIS,

           Plaintiff,

     v.

SCENERA RESEARCH, LLC, and
RYAN C. FRY,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTIONS
TO COMPEL**

{1} The case is now in this Court after its remand from the United States District Court for the Eastern District of North Carolina following the close of the discovery period in the federal action. Plaintiff filed two motions to compel discovery in this Court pursuant to Rules 15.2 and 15.8 of the General Rules of Practice and Procedure for the North Carolina Business Court and Rule 37 of the North Carolina Rules of Civil Procedure.[1] One motion raises issues regarding attorney-client privilege. The second motion raises issues regarding whether Defendants have complied with Rule 34(b)(2)(E) requirements imposed where the producing party elects to produce documents as they are kept in the regular course of business.

> *Young Moore and Henderson P.A. by Walter E. Brock, Jr. and Andrew P. Flynt, and Coats & Bennett PLLC, by Anthony J. Biller, for Plaintiff Robert Paul Morris.*

---

[1] The motions restate in this Court motions that were filed in but not ruled upon by the federal court. The discovery and disputes arise under the discovery protocol in the federal action and the parties agree that the issues presented by these motions are to be determined pursuant to federal rules.

*Kilpatrick Townsend & Stockton LLP, by Hayden J. Silver III and John M. Moye, for Defendants Scenera Research LLC and Ryan Fry.*

Gale, Judge.

## I. PROCEDURAL BACKGROUND

{2} On September 17, 2009, Scenera Research LLC ("Scenera"), a Delaware limited liability company with its principal place of business in Cary, North Carolina, filed a Complaint in the United States District Court for the Eastern District of North Carolina ("Federal Court Action") seeking declaratory relief with respect to ownership of certain patents, patent assignments, and bonus payments arising out of its employment of Robert Paul Morris ("Morris"), also a resident of Wake County, North Carolina.

{3} On September 25, 2009, Morris filed an action in Wake County Superior Court ("State Court Action") against Scenera and its Chief Executive Officer and Managing Member Ryan C. Fry ("Fry"). Morris' Complaint alleged that Scenera failed to pay promised wages under the North Carolina Wage and Hour Act; that the company terminated his employment in retaliation for his wage complaints in violation of the N.C. Retaliatory Employment Discrimination Act; that the company fraudulently induced him to defer bonus payments and to assign patents; that Scenera was unjustly enriched by having Morris defer bonuses and assign his patents to the company without adequately compensating him; and that Scenera otherwise breached its employment contract with Morris. Scenera and Fry removed Morris' State Court Action to the Eastern District of North Carolina on October 5, 2009, after which Scenera asserted counterclaims for breach of fiduciary duty and breach of assignment.

{4} Morris moved to dismiss the Federal Court Action and to remand the State Court Action on the basis that complete diversity jurisdiction was lacking. On January 21, 2010, the Eastern District denied that motion and consolidated the two actions for discovery and further proceedings.

{5} The federal court accepted the parties discovery protocol pursuant to Fed. R. Civ. P. 26(f) ("Joint Rule 26(f) Report"). The parties conducted discovery from December 2009 to December 2010, consisting of approximately twelve (12) depositions and the exchange of voluminous written discovery.

{6} On December 15, 2010, Morris again moved to dismiss the Federal Court Action and to remand the State Court Action for lack of complete diversity. On February 16, 2011, the district court dismissed the Federal Court Action and remanded the State Court Action to Wake County Superior Court. The court did not rule on pending motions to compel.

{7} After removal, Scenera filed a Second Amended Answer and Counterclaim in the Wake County action, effectively adding its claims for declaratory relief previously asserted in the Federal Court Action. On March 31, 2011, Scenera and Fry filed a Notice of Designation as a Complex Business Case pursuant to N.C. Gen. Stat. § 7A-45.4 and an alternative motion for designation as an Exceptional Case. On April 1, 2011, Chief Justice Sarah Parker designated this case as a mandatory complex business case.

{8} On June 10, 2011 Morris filed his Motion to Compel Discovery (Privilege Issues) and on June 17, 2011, Morris filed his Motion to Compel Discovery (Document Production Issues). The Motions were fully briefed and the Court heard oral argument.

## II.    FACTS

{9} Morris submitted approximately 125 requests for production and Scenera reviewed a total of 33,000 documents and produced approximately 22,000 documents (over 350,000 pages) to Morris on a rolling basis over a period of 3-4 months. (Aff. of John M. Moye ("Moye Aff.") ¶ 5.) Counsel for Morris stated at oral argument that Scenera has recently produced an additional approximate 50,000 pages.

{10} Morris initially requested in the Joint Rule 26(f) Report that documents be produced to him in PDF format. On June 23, 2010 he revised his request and asked that the documents be produced on CDs with the following file types

included: (1) single page TIFF files; (2) OCR (Optical Character Recognition) files; and (3) load files for the Summation document viewing platform. (Moye Aff. ¶ 11.) In addition to these file types, documents were to be produced with a ".cvs" file containing the specific metadata fields that the parties had agreed to in the Joint Rule 26(f) Report. (Moye Aff. ¶¶ 13, 30.) The agreed to metadata fields were different for e-mails and other electronic documents. The Joint Rule 26(f) Report did not require that other metadata fields, such as directory structure or file structures, be extracted or preserved. (Moye Aff. ¶ 9.)

{11} John Moye, an attorney at Kilpatrick Stockton & Townsend LLP, worked closely with Scenera and its IT staff to gather potentially responsive documents from Scenera's servers to be collected and produced to Kilpatrick on hard copy media. (Moye Aff. ¶ 15.) Scott Bardsley and Rob Vatz collected the potentially responsive documents through key word and phrase searches. (Dep. of Scott Bardsley ("Bardsley Dep.") 43:23–25.) Bardsley and Vatz used an application to pull the electronic versions of those documents from Scenera's infoRouter system. (Bardsley Dep. 44:2–5.) Finally, electronic versions of the documents pulled by the application were burned to DVDs. (Bardsley Dep. 44:5−6.) Bardsley explained that the DVD folder structure mirrors that of infoRouter. (Bardsley Dep. 44:14−21; Dep. of Rob Vatz ("Vatz Dep.") 59:15.) Bardsley also explained that the infoRouter has libraries that are root directories, and subfolders may be created under the root directories. (Bardsley Dep. 97:20–22.)

{12} After receiving the DVDs, Kilpatrick attorneys engaged an outside vendor to extract the metadata fields that were stipulated to by the parties in the Joint Rule 26(f) Report. The outside vendor was not instructed to preserve file paths or file folders. (Aff. of Myles McLeod ("McLeod Aff.") ¶ 43; Moye Aff. ¶¶ 19, 20.) The outside vendor loaded the 33,000 documents onto Concordance for review by Kilpatrick attorneys in the order received from Scenera's IT staff. (Moye Aff. ¶¶ 21, 27.) Moye indicates that the documents were produced in the order in which they had been loaded onto Kilpatrick's Concordance database, preserving the order in which Kilpatrick received the documents from Scenera. (Moye Aff. ¶ 27.) Morris,

however, contends that the documents, in fact, were not produced in any apparent order, and that in many instances, e-mails are separated from their attachments, so that the production was an electronic version of a "document dump." It is also clear that Morris concedes his document requests are broad.

{13} In a letter accompanying its first production, Scenera indicated that it would make document productions on a "rolling basis." (App. to Morris's Br. in Supp. of Mot. to Compel Disc. (Doc. Prod. Issues) ("App. to Morris Supp. Br. (Doc. Prod.)") Ex. 2.) After the first set of production was received on July 1, 2010, Morris' counsel, Walter Brock, wrote a letter to Scenera's counsel objecting to the organization of production, arguing that Scenera had not followed Rule 34. (App. to Morris's Reply Br. in Supp. of Mot. to Compel Disc. (Doc. Prod. Issues) ("App. to Morris Reply Br. (Doc. Prod.)") Ex. 18.) Brock asserted the same failure in letters dated August 24, 2010 and September 7, 2010. (App. to Morris Reply Br. (Doc. Prod.) Exs. 19, 20.) The parties continued to e-mail over the next few months. Morris has consistently contended that Scenera is required by Rule 34 to correlate each document it was producing to particular requests for production. Scenera has contended otherwise and demanded that Morris cite authority supporting its position. Scenera then continued to maintain that it had fully complied with Rule 34 by following the Joint Rule 26(f) Report procedures and producing the documents in the order in which they had been received from Scenera. Ultimately, this disagreement has led to the current argument distinguishing between "form" and "organization" of the document production and whether agreements within the Joint Rule 26(f) Report modify the default provisions of Rule 34(b)(2)(E).

{14} Both the Joint Rule 26(f) Report entered December 7, 2009 and the Revised Joint Rule 26(f) Report entered February 2, 2010 contain provisions relating to privilege logs. The parties agreed that communications with outside counsel need not be logged. Scenera produced its first privilege log to Morris on October 22, 2010, and a supplemental privilege log on November 4, 2010. Ultimately, Scenera's privilege log listed documents with Stephen Tytran ("Tytran"), Lawrence Brannian ("Brannian"), and Maggie Ramos ("Ramos") as

covered by the attorney-client privilege, and which claims are now in dispute. Scenera did not log every communication with its outside attorneys, pursuant to a stipulation in the Joint Rule 26(f) Report. (Moye Aff. ¶ 10.) The parties dispute the meaning of the Joint Rule 26(f) Report stipulating that ". . . correspondence between any party and his or its outside counsel" need not be logged. (App. to Morris's Br. in Supp. of Mot. to Compel Disc. (Privilege Issues) ("App. to Morris Supp. Br. (Privilege)") Ex. 1 at 7.) Morris disputes whether a document simply carbon copied to outside counsel constitutes "correspondence" within the scope of this stipulation.[2]

{15} Scenera logged and withheld as privileged documents claimed to be subject to the attorney-client privilege. Scenera's final privilege log listed approximately 700 documents withheld on the basis of privilege. (Moye Aff. ¶ 11.)

{16} Tytran is a duly licensed attorney employed as Scenera's General Counsel. (Aff. of Steven J. Tytran ("Tytran Aff.") ¶ 1.) Tytran was asked by Defendant Fry on May 17, 2009 to provide legal assistance to Scenera in connection with the employment dispute with Morris. (Tytran Aff. ¶ 4.)

{17} Brannian is an outside attorney with whom Scenera has consulted about the Morris employment dispute. (Moye Aff. ¶ 6.)

{18} Tytran testified by affidavit that he communicated regularly with Ramos, a former Scenera employee who works at Scenera's predecessor company, Flashpoint. (Tytran Aff. ¶ 12.) Tytran communicated with Ramos regularly to discuss Scenera's legal strategy in handling the Morris dispute. (Tytran Aff. ¶¶ 12–13.) Tytran's affidavit does not specify whether or which of these communications were in writing. Scenera contends that such communications fall within a common interest privilege because Ramos is the executive assistant to Stanley Fry, Defendant Fry's father, who is a founder, owner of, and investor in Scenera and therefore has a financial interest in this litigation.

---

[2] In addition to substantive disagreement with Morris' position, Scenera contends that the issue of whether communications carbon copied to outside counsel must be logged should not be considered because this issue was not presented to the federal court and is, therefore, untimely.

{19} Documents produced for *in camera* review demonstrate that Tytran communicated with Ramos in an effort to locate documents which Ramos might have as a result of her prior employment and which Tytran was trying to locate as he fashioned legal advice to Scenera. The documents reviewed *in camera* do not fit the description of communications referred to in paragraph 12 of Tytran's affidavit.

{20} The Joint Rule 26(f) Report includes a "claw-back" provision regarding inadvertent disclosure. It provides:

> The production of attorney-client privileged materials, work product protected materials, or trial preparation materials shall not constitute a waiver of those protections. In the event of the production of such protected information, the Parties will follow the procedure set out in Rule 26(b)(5)(B).

{21} On November 9, 2010, during a deposition of one of Scenera's witnesses, Scenera's counsel became aware that communications from Brannian had been produced. (Moye Aff. ¶ 6.) The witness was instructed to not answer questions regarding the documents. On November 10, 2010, Scenera's counsel wrote to Morris' counsel asserting that the documents had been inadvertently produced and demanding their return. (App. to Morris Supp. Br. (Privilege) Ex. 22.) Morris' counsel did not initially respond to this letter. (Moye Aff. Ex. C.) On November 29, 2010 and again on December 11, 2010, Scenera wrote to Morris' counsel and asked that the documents be destroyed in accordance with the parties' Joint Rule 26(f) Report. (Moye Aff. Ex. C.) Morris responded by sequestering the documents pending a resolution of whether they were, in fact, inadvertently disclosed. (Moye Aff. Ex. C.)

{22} On November 30, 2010, Morris filed a motion in the Federal Action to compel Scenera to organize and label its production to correspond with categories in Morris' document requests. On December 15, 2010 Morris filed a motion in the Federal Action to compel regarding Scenera's privilege claims. (Mot. to Compel Disc., Dkt. 58, 66.) The federal court did not rule on these motions prior to dismissing the Federal Action and remanding the State Action.

{23} The Parties submitted their Case Management Report in this action on May 20, 2011, indicating that Morris would file updated motions to compel.

{24} On June 7, 2011, the parties met to discuss the ongoing discovery issues. (Moye Aff. ¶ 39.) Scenera agreed to ask Kilpatrick's discovery vendor whether there were any additional metadata fields that could be recovered from the electronically stored information ("ESI"). (Moye Aff. ¶ 39.) The only filepath preserved by the vendor was a field entitled "file name" which was provided to Morris on June 9, 2011. Scenera has continued to work with Morris in locating some documents that Morris contends are missing from Scenera's document production. (Moye Aff. ¶¶ 38, 41.)

{25} Morris filed the present motions to compel on June 10 and June 15, 2011.

{26} Prior to oral argument on the motions, Scenera submitted certain documents to the Court for review *in camera.* These include communications by Tytran identified in Exhibit 29 to Morris' Brief in Support of Motion to Compel (Privilege Issues). The Court is informed that Morris believes that there are additional Tytran communications with Ramos that were logged but which have not been, but will be, produced *in camera.*

### III.   MORRIS' MOTION TO COMPEL (PRIVILEGE)

A. Claim of Attorney-Client Privilege as to Tytran Communications with Current Scenera Personnel

{27} Morris asserts that communications by Tytran withheld from production on the basis of privilege are likely not, in fact, privileged because they relate to factual matters rather than providing legal advice. Morris states that inferences to this effect can be drawn from other Tytran communications that were produced without a claim for privilege.

{28} In North Carolina, the attorney-client privilege applies only if: (1) the relation of the attorney and the client existed at the time the communication was made; (2) the communication was made in confidence; (3) the communication related to a matter about which the attorney is being professionally consulted; (4) the communication was made in the course of giving or seeking legal advice for a

proper purpose although litigation need not be contemplated; and (5) the client has not waived the privilege. *State v. Murvin*, 304 N.C. 523, 531, 284 S.E.2d 289, 294 (1981). "If any of these five elements is not present in any portion of the attorney-client communication, that portion of the communication is not privileged." *In re Miller*, 357 N.C. 316, 336, 584 S.E.2d 772, 787 (2003). "The burden is always on the party asserting the privilege to demonstrate each of its essential elements." *Id.* The responsibility of determining whether the attorney-client privilege applies belongs to the trial court, not the attorney asserting the privilege. *Id.* When the party seeking information has, in good faith, come forward with a non-frivolous assertion that the privilege does not apply, the trial court may conduct an *in camera* examination of the substance of the communications. *Id.*

{29} North Carolina courts apply the protection of the attorney-client privilege to in-house counsel in the same way that it is applied to other attorneys. *Isom v. Bank of Am., N.A.*, 177 N.C. App. 406, 411, 628 S.E.2d 458, 462 (2006). A company and its in-house counsel may, however, only benefit from the protection of the attorney-client privilege if the attorney is functioning as a legal advisor when the communication occurs. *Id.* A communication will not be deemed privileged merely because an in-house attorney was copied on the communication or forwarded a copy of a document. *Id.* When the in-house counsel's legal advice is merely incidental to business advice, the privilege does not apply. *U.S. v. Cohn*, 303 F. Supp. 2d 672, 683 (D. Md. 2003).

{30} Scenera voluntarily submitted thirty-six (36) documents for *in camera* review and the Court has reviewed the documents. The Court concludes that each of the documents is, in fact, a privileged attorney-client communication as they were made in the course of Tytran's providing legal advice. Morris is not entitled to the production of these documents.

B. Claim of Attorney-Client Privilege for Communications Between Tytran and Ramos

{31} Scenera withheld production of communications between Tytran and Ramos on the basis of attorney-client privilege. Certain of those communications were included in the documents produced for *in camera* review. While Scenera claims in its briefing that all communications with Ramos are privileged by application of the common-interest doctrine, at least as to those documents submitted for *in camera* review, the Court further considered the attorney-client privilege as it has been extended to communications with former employees made for the purposes of providing legal advice.

{32} In *Upjohn Co. v. United States*, the Supreme Court held that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S. Ct. 677, 683, 66 L.Ed.2d 584, 592 (1981). In that case, the privilege protected the attorney's investigation notes and questionnaires of the interviews with Upjohn employees. *Id.* Ultimately, *Upjohn* made clear that "fact finding which pertains to legal advice counts as professional legal services." *United States v. Rowe*, 96 F.3d 1294, 1297 (9th Cir. 1996). The Fourth Circuit has held that the *Upjohn* analysis for determining which employees fall within the scope of attorney-client privilege applies equally to former employees. *In re Allen*, 106 F.3d 582, 606 (4th Cir. 1997).

{33} The Court finds that those communications between Tytran and Ramos that were submitted for *in camera* review are privileged pursuant to *Upjohn* as applied within the Fourth Circuit, as in each instance, the communication was an effort by Tytran to gather factual information necessary to his providing legal advice. Morris is not entitled to the production of these documents.

{34} The Court understands that other communications between Tytran and Ramos which will be submitted for *in camera* review include a claim of privilege that may depend upon application of a common-interest extension of the attorney-client privilege. The Court understands that Scenera claims that Ramos is an executive assistant to Mr. Stanley Fry, Defendant Ryan Fry's father, such that

communications with her are the equivalent of communications with Stanley Fry, and that communications with Stanley Fry are privileged under the common-interest doctrine because he is a founder, member of, and investor in Scenera and, therefore, financially interested in the outcome of the litigation.

{35} The Court stated at oral argument on the motions to compel that it is dubious as to whether Mr. Fry's financial interest is alone adequate to support invocation of the common interest privilege as the Court understands it to have been adopted within the Fourth Circuit.[3]

{36} The common-interest or joint-defense privilege extends the protection of the attorney-client privilege to communications between parties who share a common litigation interest. "For the privilege to apply, the proponent must establish that the parties had some common interest about a legal matter." *Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P.*, No. 5:09-CV-353-F, 2011 WL 761480 at *3 (E.D.N.C. Feb. 24, 2011) (quoting *In re Grand Jury Subpoena Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005)). The Fourth Circuit has recognized the joint-defense/common-interest doctrine where the facts showed an actual agreement to prosecute claims. *In re Grand Subpoena Under Seal*, 415 F.3d 333 (4th Cir. 2005). "A party requesting that the court apply this rule must demonstrate that (1) the communicating parties shared an identical legal interest, (2) the communication was made in the course of and in furtherance of the joint legal effort, and (3) the privilege had not been waived." *Neighbors Law Firm, P.C.*,

---

[3] The Court since considered whether communications between Tytran and Stanley Fry might be privileged because the attorney-client privilege extends not only to the corporation but also to its individual owners or members. In doing so, the Court was mindful that it is not always clear whether matters involving a limited liability company should be governed by the law of corporations or the law of partnerships. Robinson's treatise indicates that, at least for derivative actions, the law of corporations controls the availability of the attorney-client privilege. *Robinson on North Carolina Corporation Law* § 34.04[5]. However, there is limited case law that clarifies how the attorney-client privilege applies to a limited liability company. *See Montgomery v. Etrepid Technologies, LLC*, 548 F.Supp.2d 1175, 1180 (D. Nev. 2008) (otherwise summarizing case law as to whether present or former management have access information for which the corporation has a privilege or the authority to waive to waive that privilege). It is generally well-established that the attorney-client privilege between a corporation and its attorney belongs to the entity and not to individual owners, although individual managers necessarily must act on the corporation's behalf. There has been no suggestion that Stanley Fry is a Scenera manager.

2011 WL 761480 at *3. Generally, the privilege has been adopted to facilitate communications between separate groups of counsel representing separate clients having similar interests and actually cooperating in the pursuit of those interests. One leading treatise states that a party relying on the common-interest doctrine must demonstrate that the specific communications at issue were designed to facilitate the common *legal* interest, and that proving a common business or commercial interest will not suffice. 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 26.49 (3d ed. 2011).

{37} However, the Court reserves any final ruling and interpretation of the application of the privilege to Tytran communications with Ramos until such documents are reviewed *in camera*.

### C. Scenera's Communications with Brannian

{38} The motion to compel and supporting memoranda deal at length with whether the disclosure in Scenera's document production of communications with its outside counsel Brannian waived any claim of attorney-client privilege related to those documents. At oral argument, Morris raised the separate initial question whether at least some of those documents would not be privileged in the first instance because they were never intended to be confidential. *See State v. Murvin.* While drafts of potential employment agreements prepared by counsel for client review would be privileged up to the point at which they were intended to be given to Morris, the Court does not know how it could determine the time at which a document drafted by counsel for client approval had reached the stage at which the intent of confidentiality came to an end. The Court determines that the motion to compel as to the Brannian communications turns on the issue of waiver, not on whether the documents were privileged in the first instance.

{39} Morris has asserted multiple positions on which he contends the Court can find a waiver of privilege as it relates to the Brannian documents. He first asserts that Scenera initially produced the documents intentionally. The Court

finds no evidentiary basis on which it should find that the waiver was intentional. As a corollary, Morris argues that Scenera waived any privilege on communications with Brannian when Defendant Fry affirmatively testified that he never promised what Morris asserts in this litigation, thereby putting Fry's intent in issue and waiving privilege for documents that may be relevant to determining such intent. Finally, Morris argues that Scenera must prove that it took adequate precautions before producing the Brannian documents, and that it cannot do so.

{40} Scenera's primary position is that the claw-back provision of the Joint Rule 26(f) Report controls and that Scenera need make no further showing that its waiver was inadvertent. Alternatively, Scenera contends that it has adequately demonstrated that its production was inadvertent and that no waiver should be found.

{41} Generally, the proponent or party claiming rights or benefit of an assertion bears the burden of establishing his contention. *Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group, Inc.*, 116 F.R.D. 46, 48 (M.D.N.C. 1987). The proponent of the attorney-client privilege has the burden of proving its applicability. *United States v. Tedder*, 801 F.2d 1437, 1441 (4th Cir. 1986). In the absence of an agreement to the contrary, when a document has been voluntarily disclosed and the proponent of the privilege seeks to show the disclosure was inadvertent, the proponent must prove the disclosure was inadvertent, and that the privilege has not been waived. *Parkway Gallery Furniture, Inc.*, 116 F.R.D. at 48 (citing *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323 (N.D. Cal. 1985)). However, under more modern practice, parties are encouraged to and often do reach agreements regarding inadvertent production, and the courts are to enforce such agreements. Such agreements may modify or eliminate a court's need to review factors traditionally used to judge whether a waiver was inadvertent.

{42} The advent of electronic discovery has caused a reexamination of many issues, including inadvertent waiver. Both the state and federal courts encourage agreements between parties that provide what course to follow in the event of the production of privileged materials. Such agreements may include "claw-back"

agreements which provide that inadvertent production will not constitute a waiver, and that the receiving party must return privileged materials to the producing party so long as the producing party takes appropriate corrective action after the production of privileged materials. The Conference of Chief Justices in 2006 published "Guidelines for State Trial Courts Regarding Discovery of Electronically-Stored Information," (referred to hereafter as "Conference Guidelines") (those are appended to this Court's decision in *Bank of Am. Corp. v. SR Int'l Bus. Ins. Co.,* 2006 NCBC 15, No. 05-CVS-5564, 2006 WL 3093174, at *16 (N.C. Bus. Ct. Nov. 1, 2006) (Tennille, J.)). Conference Guideline 4 encourages the parties to agree on procedures to be followed in the event of inadvertent production of privileged materials. Conference Guideline 8 details factors for the Court to consider in determining whether the inadvertent production of privileged materials constitutes a waiver. The Comment to Conference Guideline 8 makes clear that, "[t]his Guideline applies when the parties have not reached an agreement regarding the inadvertent disclosure . . ." That is, an agreement controls over the default provisions in the Conference Guideline. That same Comment further noted that the Conference of Chief Justices elected not to impose a presumption against waiver although certain states had done so. The clear intent of the Conference Guidelines is to encourage agreement and to enforce those agreements when made to prevent an inadvertent waiver of privilege.

{43} The Conference Guidelines are consistent with current federal practice. The federal rules were amended in 2006 to encourage agreement on procedures to be followed in the event of inadvertent production. Such procedures are typically discussed at the Rule 26(f) conference. Rule 26(b)(5)(B) provides a procedure whereby a producing party can make a claim for inadvertent production in which event the receiving party is obligated to sequester, destroy, or return the privileged material. Rule 26(b)(5)(B) provides for such procedures but does not itself provide guidance regarding the underlying substantive law of privilege and whether inadvertent production constitutes a waiver. *See generally The Sedona Principles (Second Edition): Best Practices Recommendations & Principles for Addressing*

*Electronic Document Production,* (*"Sedona Principles"*) cmt. 10.a. (2007). Rule 34(b)(2)(E) allows parties to reach specific agreements on the manner of producing documents, including ESI.

{44} The federal discovery rules and agreements regarding privilege should be considered alongside Federal Rule of Evidence 502(b). As amended in 2008, FRE 502(b) provides that:

> When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Fed. R. Civ. P. 26(b)(5)(B).

Fed. R. Evid. 502(b). FRE 502(d) states "[a] federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court – in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d). Thus, if the parties agree to a claw-back arrangement to protect the privilege and their agreement is incorporated as an order of the court, that order will be enforceable in other state and federal proceedings. *See generally, The Sedona Conference*, *Working Group on Electronic Document Retention & Production*, *Cooperation Guidance for Litigators & In-House Counsel*, March 2011, at 15.

{45} A waiver can be avoided following an inadvertent production even without a claw-back agreement. As noted by the Advisory Committee for the amendments to FRE 502, the federal courts have used various factors to determine whether an inadvertent production constitutes a waiver. Fed. R. Evid. 502 Advisory Comm. Note (2008). FRE 502(b) did not "explicitly codify that test, because it is really a set of non-determinative guidelines that vary from case to case." *Id.* In evaluating whether these conditions exist in any given case, courts have applied multi-factor tests such as the one adopted by the District Court of Maryland in *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251 (D. Md. 2008), which balanced five factors: (1) the reasonableness of the precautions taken to prevent

inadvertent disclosure; (2) the number of inadvertent disclosures; (3) the extent of the disclosures; (4) any delay in measures taken to rectify the disclosures; and (5) overriding interests in justice. *Victor Stanley, Inc.*, 250 F.R.D. at 259. "The reasonableness of the privilege holder in protecting and asserting the privilege is paramount to overcoming the consequences of an inadvertent waiver." *Martin v. State Farm Mut. Auto. Ins. Co.*, No. 3:10-CV-0144, 2011 WL 1297819 at *4 (S.D.W.Va. Apr. 1, 2011). These factors are similar to those embodied in Conference Guideline 8.

{46} The Court understands that it is only necessary to turn to these factors if the parties have not reached agreement on procedures to be followed in the event of the production of privileged materials. That is, the factors are default provisions to be considered in the absence of an agreement.

{47} In this case, the parties reached agreement and it is straightforward. Their Joint Rule 26(f) Report states that: "[t]he production of attorney-client privilege materials, work product protected materials, or trial preparation materials shall not constitute a waiver of those protections. In the event of such protected information, the Parties will follow the procedure set out in Rule 26(b)(5)." The Court interprets this agreement as providing that the inadvertent production of privileged materials will not constitute a waiver, whether or not the producing party has made or can make a showing satisfying the above factors, and that the reference to Rule 26(b)(5)(B) is to provide the mechanism for the return of privileged materials but not a substantive standard for determining whether there has been a waiver.

{48} The Court concludes that Scenera's production of the Brannian documents was inadvertent. As such, the claw-back agreement in the Joint 26(f) Report is binding, the documents remain privileged, and Morris is bound by the use limitations as provided by Rule 26(b)(5)(B).

{49} Alternatively, the Court holds that Scenera has made the required showing to the extent that it was required to demonstrate those factors considered

by courts in the absence of an agreement to support a finding of inadvertent production and no waiver.

{50} The Court must separately consider Morris' argument that Scenera has waived any attorney-client privilege for those documents in the Brannian production that are relevant to show Defendant Fry's intent or lack thereof to provide Morris an incentive compensation plan in exchange for his waiver of a prior patent bonus agreement. (Morris' Reply Br. in Supp. of Mot. to Compel Disc. (Privilege Issues) 11–12.)

{51} In support of his position, Morris cites *Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81 (M.D.N.C. 2000). On close review, the Court concludes that this case actually supports Scenera's position. In *Cincinnati Ins.*, the Court reviewed the question of whether the insurance company, which intended to have the opinion of its coverage counsel introduced in support of its position, could at the same time protect from discovery that counsel's opinions and the underlying support. The court held that the introduction of testimony as to counsel's opinion waived both fact and opinion work-product, as well as attorney-client privileges. 198 F.R.D. at 87. But, in the course of its discussion, the court distinguished waiving the attorney-client privilege when the litigant's intent or state of mind, rather than the opinion of counsel, is what has been placed at issue. The court adopted the following quote from a Third Circuit opinion:

> Some decisions have extended the finding of a waiver of the privilege to cases in which the *client's state of mind may be in issue in the litigation. These courts have allowed the opposing party discovery of confidential attorney client communications in order to test the client's contentions.* These decisions are of dubious validity. While the opinions dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed. *Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are*

> *vital, highly probative, directly relevant or even go to the heart of an issue.*

*Id.* (quoting *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863-64 (3rd Cir. 1994).

{52} The Court believes the same distinction applies here. Mr. Fry's testimony did not waive the attorney-client privilege protection for the Brannian documents.

### D. Subject Matter Waiver

{53} A waiver of certain communications can waive the attorney-client privilege not only as to the particular communication but to other communications relating to that same subject matter. *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984). Morris contends that the production of the Brannian documents results in a subject matter waiver as to employment agreements drafted for presentation to Morris. However, here the Court has determined that there has been no such waiver. Further, even if there were a waiver, the Court would also find that it was an inadvertent waiver, not an intentional one. Under FRE 502(a) an inadvertent waiver does not lead to a subject matter waiver. "By requiring the waiver to be intentional, Congress made it clear that a subject-matter waiver cannot result from an inadvertent disclosure." *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 503 (Fed. Cl. 2009). The rule is consistent with a prior decision of the Middle District of North Carolina holding that

> [t]he general rule that a disclosure waives not only the specific communication but also the subject matter of it in other communications is not appropriate in the case of inadvertent disclosure, unless it is obvious a party is attempting to gain an advantage or make offensive or unfair use of the disclosure.

*Parkway Gallery Furniture, Inc.*, 116 F.R.D. at 52. One leading treatise states the effect of FRE 502 is that an inadvertent disclosure of protected information "can

never result in a subject matter waiver." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 34.13 (3d ed. 2011).

{54} For these various reasons, Scenera has not waived the attorney-client privilege on the subject matter of potential employment agreements or an incentive compensation agreement with Morris.

### E. Logging Communications Carbon Copied to Outside Counsel

{55} Morris contends that Scenera failed to disclose communications where outside counsel was only carbon copied, and that merely carbon copying counsel does not render the document a "communication" with counsel. Morris further suspects that there may then be documents carbon copied to outside counsel that Scenera has not carefully reviewed for privilege at all. In their Revised Joint Rule 26(f) Report, both parties agreed that they would not be required to include on the privilege log "correspondence between any party and its outside counsel." The Court concludes that the Report should be interpreted in accordance with its plain language and that documents carbon copied to outside counsel are "communications" subject to the parties' agreement. This does not mean that such documents are necessarily privileged, but if they are privileged, they do not need to be logged. The parties advised by their recent status report that Scenera's counsel will conduct a further review of communications carbon copied to counsel.

## IV. MORRIS' MOTION TO COMPEL (DOCUMENT PRODUCTION ISSUES)

{56} Morris' Motion to Compel (Document Production Issues) seeks to have Scenera organize and label its document production to correspond to the categories of the document requests. Scenera contends that it is not required to do so because Rule 34(b)(2)(E) allows the parties to reach agreement on production and further provides Scenera the option to produce documents and ESI as they are kept in the usual course of business, which it has done by producing the materials in a

searchable format. Morris contends that Scenera was not forwarded materials as kept in the usual course of business, even if they are searchable.

{57} Rule 34(b)(2)(E) of the Federal Rules of Civil Procedure provides, that "unless otherwise stipulated or ordered by the court," a party responding to a request for production of documents or ESI "(i) must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;" and "(ii) if a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in reasonable usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(i)(ii). [4]

{58} The two subsections recognize a distinction between provisions for "organization" and "form," but each of these default provisions may be modified by agreement. "The Rule was amended in 1980 to prevent the juvenile practice whereby the producing party purposely rearranged documents prior to production in order to prevent the requesting party's efficient use of them." *United States v. O'Keefe*, 537 F. Supp.2d 14 (D.C. 2008) (citation omitted). The Rule was again amended in 2006 to clarify how the rule applies to ESI, recognizing that electronic information is not necessarily most useable in its native form. *See generally, Sedona Principles*, cmt. 12.a.

{59} Here, the parties clearly agreed as to the form of electronic information to be produced in their Joint Rule 26(f) Report, separately specifying the metadata to be preserved for e-mails and other material. The motion to compel does not complain as to the form of the production (although Morris now claims that the limited metadata to which he agreed does not facilitate his ability to search the production effectively). Rather, Morris complains as to the organization of the production (or lack of it). The Court cannot determine solely by its language whether the Joint Rule 26(f) Report intended to vary the Rule 34(b)(2)(E)(i)

---

[4] Similar provisions will be added to the North Carolina Rules of Civil Procedure as of October 1, 2011 pursuant to H.B. 380, 2011 Session.

organizational provisions.  The Court must, therefore, turn to a review of case law, as well as the intent underlying Rule 34(b)(2)E).

{60} Case law elucidating distinctions between the "organization" and "form" requirements of Rule 34(b)(2)(E) is scant.  Morris relies heavily on *Suarez v. Earthwise*, No. C07-5577RJB, 2008 WL 2811162, at *2 (W.D. Wash. July 17, 2008). There the court stated that:

> [t]he comments to Rule 34(b) discuss, without affirmatively stating, that the term 'form' relates to the diverse types of electronically stored information such as file types ('.pdf') or various storage means.  The comments do not refer to the term 'form' as encompassing the organization of all of a party's production.  Therefore, 'form' does not refer to the organizational mandates of Rule 34(b)(2)(E)(i) . . This does not resolve the issue of whether the producing party's production was adequate under that rule.

*Id.* at *2.  While *Suarez* recognizes that "organization" and "form" are distinct requirements, it also rejected the requesting party's contention that it, rather than the producing party, controls the choice of whether to produce documents in the usual course of business or to correspond to them to individual requests.  The Court was clear that this choice is granted to the producing party, not the requesting party.  In contrast to the circumstances of this case, it is clear that in *Saurez* neither had the parties reached any agreement as to the form in which electronic information was to be produced, nor had the producing party attempted to make any demonstration that the information was produced as it was kept in the usual course of business.  *Id.* at *3.  The *Suarez* court ordered that the producing party comply with the organizational requirements of Rule 34(b)(2)(E)(i), but then directed the parties to work together to develop a manner for doing so.[5]

---

[5] Morris contends that Scenera forwarded multiple copies of some documents.  The court in *Suarez* also noted that a party's complaint of an "electronic document dump" must be viewed in the context of the breadth of a party's requests–an overly broad request may generate a production that is not easily managed where a more targeted request would facilitate a more tailored ability to isolate responsive documents.  *Id.*  Electronic information presents different challenges than traditional paper discovery, and broad requests may inevitably lead to repetitive production which some would label a "document dump."  As noted by the Guidelines from the Conference of Chief Justices, "one

{61} A United States District Court in South Dakota has also determined that Rule 34(b)(2)(E) has separate requirements for organization and form of electronic information, but on facts different than those in this case. *Diesel Mach. Inc. v. Manitowoc Crane, Inc.*, No. CIV 09-4087-RAL, 2011 WL 677458, at *3 (D.S.D. Feb. 16, 2011). There, the parties agreed to produce the documents in native format but later disagreed whether their agreement had been modified to allow the documents to be produced as PDFs. *Id.* at *2–3. The receiving party contended that the document production was not useful because the documents were not organized, labeled, or indexed. *Id.* at *2. The court held that the parties had agreed to modify the form of the production of ESI, and such agreement was binding. However, the court further held that if the documents had not been produced as kept in the usual course of business, the producing party would be required to label the documents to correspond to the categories in the discovery request. *Id.* at *3. The court gave no guidance as to how that determination would be made.

{62} In this case, questions arise first whether the parties "otherwise agreed" that the default provisions in Rule 34(b)(2)(E)(i) and (ii) were modified, so that Scenera would have met its obligation so long as the electronic information was produced in the form provided by their Joint Rule 26(f) Report; and secondly, if not, whether Scenera's production was as kept in the usual course of business because the information was produced in a searchable format. Other courts have grappled with the default requirements of Rule 34(b)(2)(E) without the benefit of any prior agreement by or discussion between counsel. *See e.g., Quality Inv. Properties Santa Clara, LLC v. Serrano Elec., Inc.*, No. C 09-5376 LHK (PSG), 2011 WL 1364005 (N.D. Cal. 2011). The Court here does have the benefit of an extensively negotiated Rule 26(f) report. Yet that agreement has led to disagreement. Unfortunately, the

---

paper document originating from a corporate computer network and shared with other employees who commented on it may result in well over 1,000 copies or versions of that document in the system." Conference Guidelines, intro. p. v. Requesting the production of "every document" related to a particular subject matter may well lead to a large volume of repetitive information that is entirely responsive although cumbersome to sort through.

dispute comes before the Court after the document production is complete, and indeed the entire discovery period, has run.

{63} As noted, it is clear that unless otherwise stipulated, Rule 34(b)(2)(E) provides the responding party the choice between the two prescribed methods of production. *MGP Ingredients, Inc. v. Mars, Inc.*, No. 06-2318, 2007 WL 3010343, at *3 (D. Kan. Oct. 15, 2007). If Scenera has provided its production as materials are kept in the usual course of business, Morris cannot complain. Rule 34(b)(2)(E)(i) is noticeably silent on what constitutes "kept in the usual course of business" or by what standard a court should review whether a producing party satisfied that standard. A party who chooses that option bears the burden of demonstrating that the documents made available were in fact produced consistent with that mandate. *Pass & Seymour v. Hubbell Inc.*, 255 F.R.D. 331, 334 (N.D.N.Y. 2008); (citing *Johnson v. Kraft Foods N. Am., Inc.*, 236 F.R.D. 535, 540–41 (D. Kan. 2006)).

{64} In *Pass & Seymour*, the court noted that neither the rule nor cases decided pursuant to it reveal any bright line guidance concerning the level of detail required when producing material as maintained in the usual course of business, and then held that a party must do more than simply represent to the court and requesting party that the documents have been produced as they are maintained. *Pass & Seymour*, 155 F.R.D. at 336. The producing party must provide some information to allow the receiving party an opportunity to meaningfully use the documents. *Id.* at 337. "At a minimum, that means that the disclosing party should provide information about each document which ideally would include, in some fashion, the identity of the custodian or person from whom the documents were obtained, an indication of whether they are retained in hard copy or digital format, assurance that the documents have been produced in the order in which they are maintained, and a general description of the filing system from which they were recovered." *Id.* The court held that the producing party in that case had not met its burden. *Id.* at 338.

{65} In contrast, a federal district court held that the producing party had complied with Rule 34(b)(2)(E)(1) requirements when producing electronic

information in a form that was electronically searchable. *DE Techs., Inc. v. Dell Inc.*, No. 7:04CV00628, 2007 WL 128966 (W.D. Va. 2007). Scenera relies heavily on this case. Scenera urges that decision should control because Scenera's production can be electronically searched in two ways, by identifying fields, and by manipulating the full-text searchable OCR files. And, by specifying a manner of production designed to grant Morris this search capability, including modifying ESI from its native form and producing hard copy material in electronically searchable form, Morris negotiated and "otherwise agreed" to an organization format as provided by Rule 34(b)(2)(E).

{66} The Court believes that the provisions of the Joint Rule 26(f) Report extended beyond mere "form," and at least touched on "organization." But, the Court is concerned that the agreement has left both parties without a clear ability to search the production to identify the custodian or person from whom any particular document or ESI was obtained. That ability was an important factor in the *Pass & Seymour* opinion. *See also Quality Investment Properties Santa Clara, LLC v. Serrano Elec., Inc.*, No. C 09-5376, 2011 WL 1364005 at \*3 (N.D. Cal. Apr. 11, 2011).

{67} There is support for the assertion that a production was "as kept in the usual course of business" even when the documents were not produced in the same format as they were maintained in the producing party's systems. In *DE Techs., Inc.*, the court noted, "that Dell did not produce the documents in exactly the same format as they were kept, and the produced format did not allow for 'live user interfaces.' However, Rule 34 does not necessarily require that the documents be produced in an *identical* format." *Id.* at \*2. The court then noted that the documents were searchable and that this satisfied the requirement that the documents be produced in the usual course of business, and that, in fact, the production in such a searchable format was more helpful than a hard copy of the information would have been. *Id.* at \*2–3. Here, a searchable format may not be equally helpful if a document or ESI cannot be keyed to its source. One of Morris' chief complaints is that he cannot sufficiently tie a document or ESI to its source to

determine whether or not a particular item has been produced and whether there are documents responsive to some of his requests. It is not a question of understanding Scenera's system, Morris filed an extensive affidavit detailing his thorough understanding of Scenera's document and ESI filtering systems.

{68} The Court understands that neither party now has access to metadata other than that which the parties provided by agreement would be preserved. Scenera indicates that it has no greater capability to search its production than it has afforded Morris. Scenera's counsel has, however, indicated that it may be able to generate some index that would key at least most documents by Bates number ranges to the sources from which the information was taken. Counsel needs further inquiry before representing that Scenera can do so.

{69} The Court again notes that the federal discovery rules encourage the parties reach agreement and Rule 34 expressly allows the parties to modify the default provisions of Rule 34(b)(2)(E). There are often particularly good reasons for modifying the Rule's defaults to meet the needs of a particular case. The ability and need to manipulate different forms of electronic information will vary from case to case. *See generally, Sedona Principles,* cmt. 12.b. In some instances, producing documents in native format in the exact manner in which it is kept in the usual course of business would be counterproductive to an ability to utilize the information effectively for the needs of the particular litigation. *Id.* At the same time, converting information from native format to a more usable image production format, such as OCR, TIFF, or PDF files, can be time consuming and expensive. *Id.* When undertaking to convert files to these formats, the producing party is undertaking efforts to modify documents from their normal form to facilitate use in the litigation and generally the cost of doing so is not shifted. Here, the parties agreed on converting Scenera's documents and ESI to certain formats. The parties had the opportunity to negotiate what metadata would be needed and would or would not be preserved. The Court believes these agreements extended beyond form into the area of "organization," within the meaning of Rule 34(b)(2)(E).

{70} The Court does not, however, wish to resolve the current matter solely on a technical construction of the language of the Joint Rule 26(f) Agreement. It is also mindful of the purposes underlying Rule 34. *Sedona Principles, comment 12.b.,* reviewed the Advisory Committee notes to the 2006 amendments to the federal discovery rules in depth. The Comment summarized the purposes of Rule 34(b)(2)(E) as being "to encourage forms of production that would be inexpensive for the producing party and reasonably useable for the requesting party; and to avoid costly data conversion on the one hand, and the electronic equivalent of the 'document dump' on the other hand." The Rule encourages the parties to reach agreement but provides default provisions in the absence of such agreement. *Id.* It is much more difficult for a court, after the fact, to order procedures to achieve those purposes.

{71} Unfortunately, the Court now reviews the dispute between the parties after the act of production. The briefs on the motion to compel offer the Court a choice between ordering Scenera on the one hand to now go back through its production to organize and label them to correspond to individual document requests or on the other hand to leave Morris with what he has and treat him as a victim of his own agreement. Neither of these choices is particularly attractive. The Court is reluctant to require Scenera to incur the expenses of reviewing its entire production to correlate it to the individual document request. At the same time, the Court is sensitive to Morris' assertions that he is hampered in preparing for critical issues in the litigation. The Court has inquired whether Scenera is able, with reasonable efficiency, to provide some index for its production that keys the documents by Bates number range to the source from which the documents were obtained. If it can, some force would be removed from Morris' arguments and claim of a "document dump."

{72} While the Court is left to exercise its discretion to determine what, if any, further discovery procedures fairness dictates, it cannot appropriately make that final determination until being further informed as to whether and to what degree Scenera can provide Morris with information that correlates its document

production to the source from which files were taken. Scenera will, therefore, be directed to provide a report to the Court in that regard. Following its receipt of that report, absent further agreement between the Parties, the Court will make a final ruling on Morris' Motion to Compel (Document Production Issues). The Court encourages the parties to avoid the necessity for such further ruling by reaching agreement.

## V. CONCLUSIONS

{73} Based on the foregoing, the Court concludes:

1.  The Tytran documents submitted for *in camera* review are privileged attorney-client communications;

2.  The Tytran-Ramos communications submitted for *in camera* review are privileged attorney-client communications;

3.  Scenera's production of the Brannian documents was inadvertent;

4.  The inadvertent disclosure of the Brannian documents did not result in a waiver of the attorney-client privilege;

5.  There has been no waiver of the attorney-client privilege on the subject matter of potential employment agreements with Morris;

6.  Scenera should not be required to supplement its privilege log to include communications carbon copied to outside counsel;

7.  This Order does not constitute a ruling on whether communications between Tytran and Ramos which have not yet been submitted for *in camera* review are protected by the attorney-client privilege or the common interest privilege.

{74} IT IS THERFORE ORDERED THAT:

1.  Morris' Motion to Compel Discovery (Privilege Issues) is DENIED except as to additional communications between Tytran and Ramos which have not yet been submitted for *in*

*camera* review; the Court's ruling as to those documents is reserved;

2. Scenera shall provide the Court with a supplemental report within ten (10) business days whether and to what extent it can provide Morris with an index that corresponds its document production to the source files from which the documents or ESI was taken. The Court reserves its ruling on the Motion to Compel Discovery (Document Production Issues) pending its review of that report.

This is the 26th day of August, 2011.